MICHAEL KAUFMAN (SBN 254575)
mkaufman@aclusocal.org
LIGA CHIA (SBN 328143)
lchia@aclusocal.org
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
1313 West 8th Street
Los Angeles, CA 90017
Telephone: (213) 977-5232
Facsimile: (213) 977-5297

MICHAEL TAN (SBN 284869)
mtan@aclu.org
NOOR ZAFAR (*pro hac vice* application forthcoming)
nzafar@aclu.org
AMERICAN CIVIL LIBERTIES FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 549-2618
Facsimile: (212) 549-2654

CARMEN IGUINA GONZALEZ (SBN 277369)
ciguina@aclu.org
AMERICAN CIVIL LIBERTIES FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
915 15th Street. NW,
Washington, DC 20005
Telephone: (202) 675-2322
Facsimile: (202) 737-0017

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION FOUNDATION AND AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF SOUTHERN CALIFORNIA,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT,<br><br>Defendant. | CASE NO.: 2:22-CV-01291<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE FREEDOM OF INFORMATION ACT, 5 U.S.C. § 552** *et seq.* |

# INTRODUCTION

1. Plaintiffs American Civil Liberties Union Foundation and American Civil Liberties Union Foundation of Southern California (together, the "ACLU") bring this action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, against the United States Department of Homeland Security, Immigration and Customs Enforcement ("ICE") to compel ICE to produce records related to one of its alternatives to detention programs, the Intensive Supervision Appearance Program ("ISAP").

2. ICE's activities with respect to the surveillance and monitoring of immigrant communities are a matter of great concern to the public. Thousands of noncitizens are placed in ISAP while their immigration cases are pending in court or while the government seeks to effectuate their deportation. As part of ISAP, noncitizens are subjected to intrusive monitoring and burdensome requirements, including the use of ankle monitors with GPS tracking, smart phone applications with facial recognition and location monitoring, home confinement, office check-ins, and unannounced house visits.

3. Noncitizens and their advocates have raised serious concerns with the intrusion that they are required to live with day-to-day and the impact that constant surveillance has not only on their privacy and physical and mental wellbeing, but also that of their families and communities.

4. The harms imposed by these programs are exacerbated by the length of time that noncitizens are subjected to ISAP and the lack of transparency about de-escalation procedures. Government statistics reveal that, on average, noncitizens are subjected to ISAP for approximately 837.8 days. Many advocates and their clients express a deep frustration with how the program is run and how difficult it is to be de-escalated, even after an individual has complied with their supervision requirements and made multiple requests to ICE officers.

5. Plaintiffs submitted the FOIA requests at issue here, along with

requests for expedited processing and fee waiver, on January 6, 2022. To date, they have received no response from Defendant, either acknowledging receipt of the requests or responding with the requested records, in clear violation of FOIA. Plaintiffs bring this action to vindicate the public right to know and FOIA's promise of transparency about ICE's intrusive surveillance programs.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this action and personal jurisdiction over the parties pursuant to 5 U.S.C. § 552(a)(4)(B); § 552(a)(6)(E)(iii). This Court also has jurisdiction under 28 U.S.C. § 1331 and 5 U.S.C. §§ 701-06.

7. Venue lies in this district under 5 U.S.C. § 552(a)(4)(B).

## PARTIES

8. Plaintiff American Civil Liberties Union Foundation is a national, nonprofit, non-partisan organization dedicated to defending fundamental rights outlined in the United States Constitution and the Bill of Rights. Its work centers on protecting free speech and privacy rights, and ensuring that everyone, especially the most vulnerable, are afforded equal protection and due process. As part of these efforts, it engages in advocacy, litigation, and public education.

9. Plaintiff ACLU of Southern California is the Southern California affiliate of the national ACLU. The ACLU of Southern California covers Los Angeles, Kern, Orange, Riverside, San Bernardino, San Luis Obispo, Santa Barbara and Ventura counties. The affiliate works on a variety of issues affecting marginalized communities in the region, such as surveillance and over-policing, and has a long-standing commitment to the advancement of immigrants' rights. As part of these efforts, it engages in advocacy, litigation, and public education.

10. Plaintiffs are also committed to advocating for transparency and accountability at each level of government and empowering the public via the dissemination of information. The ACLU routinely publishes Know Your Rights

2

documents, analyses of changes in the law and government activity, and in-depth reports covering key issue areas. Plaintiffs are able to share these resources with their national network of affiliates, robust membership, and the public at-large via their website, social media sites, weekly email and text alerts, and news media coverage.

11. Defendant ICE is a component of the Department of Homeland Security and an agency within the meaning of 5 U.S.C. § 552(f)(1). ICE is responsible for the enforcement of the immigration laws and has two primary law enforcement sections, Homeland Security Investigations (HSI) and Enforcement and Removal Operations (ERO).

## FACTUAL BACKGROUND

12. Since its inception in 2004, ICE's Alternatives to Detention ("ATD") program has rapidly expanded. As of January 2022, the program has approximately 164,391 active participants.[1] This Administration has vowed to further expand the size and reach of these surveillance programs.[2] The program's rapid growth and its impact on the immigrant community have raised serious concerns about how the program operates and what de-escalation procedures are in place. While some iteration of an ATD program has been in place for almost two decades, there is no transparency or clear public guidance as to why individuals are placed in the program, what type of case management and supervision is appropriate, and what procedures allow for successful de-escalation of supervision requirements. The opacity of this program has left noncitizens and their representatives confused and

---

[1] *See* TRAC Immigration, *Alternatives to Detention (ATD)*, https://trac.syr.edu/immigration/detentionstats/atd_pop_table.html (last visited Feb. 24, 2022).

[2] *See, e.g.*, Stef W. Knight, *Scoop: Biden reinvents migrant detention*, Axios (Feb. 8, 2022), https://www.axios.com/scoop-biden-reinvents-migrant-detention-6a41d0a7-8ac2-4038-86d8-cf1e46228710.html; Ted Hesson and Mica Rosenberg, *Private prison company to test U.S. house arrest program for immigrants*, Reuters (Feb. 16, 2022), https://www.reuters.com/world/us/private-prison-company-test-us-house-arrest-program-immigrants-2022-02-16.

frustrated, as they try to advocate for less intrusive conditions for release.

## ISAP

13. ICE's largest alternatives to detention program, ISAP, is overseen by Enforcement and Removal Operations ("ERO"). ERO is responsible for managing immigration prisons and the release of individuals into the interior of the United States while their immigration proceedings are pending. ERO officers determine case management and supervision methods, while case management and technology are administered by B.I., Incorporated, a GEO Group subsidiary.[3] Case management includes a combination of face-to-face and telephonic meetings, unannounced house visits, scheduled office visits, and court and meeting alerts.[4] Technology services range from ankle monitors that employ GPS location tracking, smart phone applications that utilize both facial recognition and GPS location monitoring (SmartLINK), and telephonic reporting systems (TR).[5]

## Impact on the Community

14. While ISAP provides a pathway out of immigration prisons for some individuals, it still imposes significant restrictions on noncitizens who are subjected to the program. Ankle monitors, for example, impose serious psychological and physical burdens on noncitizens, including the stigma and shame of constantly wearing a piece of plastic attached to their ankles.[6] The monitors are bulky and painful, and can interfere with someone's ability to work,[7]

---

[3] Audrey Singer, Cong. Research Serv., R45804, *Immigration: Alternatives to Detention Programs*, at 7 (2019), https://sgp.fas.org/crs/homesec/R45804.pdf.
[4] *See id.*
[5] *See* TRAC Immigration, *ICE Alternatives to Detention Programs*, https://trac.syr.edu/immigration/detentionstats/about_atd.html (last visited Feb. 22, 2022).
[6] *See* Human Rights Watch, *Dismantling Detention: International Alternatives to Detaining Immigrants*, at 4 (2021), https://www.hrw.org/sites/default/files/media_2021/11/global_altdetention1021_web.pdf.
[7] Certain noncitizens may qualify for employment authorization while in immigration proceedings and may apply to U.S. Citizenship and Immigration

(cont'd)

4

travel, and sleep. In addition to these burdens, noncitizens are often penalized when, through no fault of their own, the technology malfunctions, such as when a battery dies or the GPS tracking fails, potentially causing what are colloquially referred to as "strikes."[8] Individuals with too many strikes suffer the risk of being re-detained.[9] These circumstances are further complicated by the fact that there is no transparency as to what factors determine whether someone's ankle monitor should be removed.[10]

15. Ankle monitors and other location-tracking tools also raise serious concerns regarding the privacy rights of noncitizens and their communities. By closely monitoring an individual's whereabouts, ICE is not only able to establish patterns of behavior for the individual wearing or carrying the tracking device, but also the behavior of their families, friends, and close networks.[11] As a result, these surveillance methods end up targeting communities of color that have historically been impacted by over-policing and over-criminalization.[12]

16. Over the last few years, ICE has also increased its use of SmartLINK, a phone application which requires noncitizens to check in through the application by taking pictures of themselves.[13] This tool also raises several data privacy concerns, including the capturing of real-time location data and the use of facial recognition and verification technologies.[14]

17. In addition to the harms imposed by ISAP's surveillance tools, the program's onerous reporting obligations significantly interfere with noncitizens'

---

Services (USCIS) for an Employment Authorization Document (EAD). Examples include individuals who have been granted immigration relief or who still have pending applications for immigration relief, such as Cancellation of Removal, Asylum and Withholding of Removal, and U Nonimmigrant Status.
[8] *See* Human Rights Watch, *supra* note 6.
[9] *See id*.
[10] *See id*.
[11] *See id*.
[12] *See id*.
[13] *See id*. at 5.
[14] *See id*.

ability to function in society and fulfill financial and parental responsibilities. Noncitizens are often required to travel long distances and endure hours-long delays as part of ISAP's overly restrictive check-in requirements.[15] Often, noncitizens in the program are required to check in with ICE in addition to its subcontractors.[16] These reporting requirements make it difficult for program participants to find regular employment and meet necessary family and community obligations.[17] Further, the program lacks any meaningful case management structure. Noncitizens in the program are not provided with an orientation as to what to expect with their immigration cases and report an overarching lack of consistency at check-ins, flagging having to meet with different officers every time they report for a check-in and, as a result, rules being applied inconsistently.[18] The lack of stability and transparency in ISAP creates uncertainty for program participants and makes the program susceptible to errors.

18.  The burdens imposed on noncitizens by the constant surveillance and onerous reporting requirements are further compounded by the fact that noncitizens are routinely subject to ISAP for prolonged periods of time. On average, noncitizens are placed in the program for over 837 days.[19] The length of time that noncitizens are subjected to constant disruption in their everyday lives, including unannounced home visits and invasive surveillance, takes a massive toll

---

[15] *See* David Secor, et al., *A Better Way: Community-Based Programming as an Alternative to Immigrant Incarceration*, National Immigrant Justice Center, at 10 (2019), https://immigrantjustice.org/BetterWay.
[16] *See* Rutgers School of Law-Newark Immigrant Rights Clinic and American Friends Service Committee, *A Report Examining the Current Use of Alternatives to Detention*, at 1 (2012), https://www.afsc.org/sites/default/files/documents/Freed-but-not-Free.pdf.
[17] *See* Secor, *supra* note 15.
[18] *See id*.
[19] Just Futures Law and Mijente, *ICE Digital Prisons: The Expansion of Mass Surveillance as ICE's Alternative to Detention*, at 5 (2021), https://www.flipsnack.com/justfutures/ice-digital-prisons-1u8w3fnd1j/download-pdf.html.

on their physical and emotional wellbeing.[20] ISAP participants have reported confusion as to why they are required to comply with such burdensome obligations for such a long period of time, and are often told that whether or not someone's requirements are successfully de-escalated depends entirely on the ICE officer in charge of their case.[21]

19. The creation of ISAP has not decreased the incarceration of noncitizens. While the budget for ISAP has increased from $28 million to $440 million, the budget for detention has also increased from $1 billion to $2.8 billion from 2006 to 2021.[22] Further, the program has increased the number of individuals subject to ICE's supervision than would otherwise be without the program, including asylum seekers who would have previously been released from detention without such intrusive forms of supervision.[23]

### Alban Nganbou

20. The harms of long-term ATD enrollment are illustrated by the case of Alban Nganbou. In November 2019, Mr. Nganbou presented himself at the San Ysidro Port of Entry requesting protection from persecution he suffered in his home country of Cameroon. After passing his credible fear interview, he was released on a $1,500 bond and enrolled in ISAP in January 2020. As part of his participation in ISAP, Mr. Nganbou was placed on a GPS ankle monitor.

21. From January 2020 to October 21, 2021, Mr. Nganbou remained at the same level of supervision. This was the case, despite Mr. Nganbou's full compliance with the program and multiple requests that ICE de-escalate his conditions of supervision and remove his GPS ankle monitor.

22. The first request to de-escalate supervision requirements was sent on February 26, 2021, after over a year on the ankle monitor. Mr. Nganbou sent a

---

[20] *See id.*
[21] *See* Secor, *supra* note 15, at 11.
[22] *See* Just Futures Law, *supra* note 19, at 4.
[23] *See id.*

7

request directly to his ISAP officer, including letters from his medical doctor and his therapist explaining the severe mental distress that the GPS monitor was causing him. That request went unanswered.

23. The second request was sent on May 17, 2021, this time to Mr. Nganbou's ICE officer, again asking that his GPS monitor be removed. This request also included letters from his medical doctor and therapist, and also referenced the new ICE enforcement priorities adopted by the Biden Administration in January 20 and February 18, 2021, explaining that Mr. Nganbou did not qualify as a priority under that new guidance. This second request also went unanswered.

24. It was not until Mr. Nganbou and his counsel sent a third de-escalation request, on October 18, 2021, that ICE finally agreed to remove the GPS ankle monitor.

25. Shortly thereafter, on October 21, 2021, Mr. Nganbou was called to the ISAP office and had his ankle monitor removed and his conditions of supervision de-escalated to office visits every 12 months.

26. In total, Mr. Nganbou spent nearly 20 months on the GPS ankle monitor and other onerous supervision conditions. Despite repeated requests, ICE has provided no explanation as to why Mr. Nganbou was subjected to such intrusive monitoring for such a long period of time or why his prior requests for de-escalation were denied.

**ACLU's Requests**

27. On January 6, 2022, Plaintiffs submitted two FOIA requests pertaining to ICE's practices and policies with respect to ISAP.

28. The first request corresponds to Mr. Nganbou's case. The request sought "all documents, memoranda, reports, worksheets, emails or other communications, and electronic database information, including location tracking information," related to the participation of Mr. Nganbou's participation in ISAP.

8

A copy of this request is attached as <u>Exhibit 1</u>.

29. The request also asked for documents at multiple stages of Mr. Nganbou's involvement with ISAP, including during ICE's consideration and decision to enroll Mr. Nganbou in ISAP, after his enrollment at ISAP and while he remained in the program, and after having received and considered requests to de-escalate the ISAP conditions imposed on Mr. Nganbou, including the requests for de-escalation on February 26, 2021, May 17, 2021, and October 18, 2021.

30. The second FOIA request pertained to the general policies and guidance related to the supervision and de-escalation of conditions of supervision for individuals subject to ISAP. A copy of this request is attached as <u>Exhibit 2</u>.

31. More specifically, Plaintiffs asked for "policies, guidance, instructions, memoranda, legal opinions, reports, studies, procedures, manuals, sample forms or checklists, templates, worksheets, training materials, emails, and/or other communications from the last ten years" pertaining to the supervision and case management of ISAP participants under the jurisdictions of all ICE Field Offices, de-escalation of conditions of supervision, and the collection, maintenance, retention, use, and dissemination of location data disclosed to ICE and its contractor B.I., Incorporated. *See* Exhibit 2.

32. Both FOIA requests asked for a fee waiver pursuant to 5 U.S.C. § 552(a)(4)(A)(iii) and 6 C.F.R. § 5.11(k) on the grounds that disclosure is in the public interest, and likely to contribute significantly to the public's understanding of the operations and activities of the government, and disclosure is not primarily in the commercial interests of Plaintiffs.

33. The requests also asked for a fee waiver pursuant to 5 U.S.C. § 552(a)(4)(A)(ii) on the grounds that Plaintiffs meet the statutory and regulatory definitions of "representative[s] of the news media," as organizations that obtain, process, and publish information about government activity to the press and the public, and the records are not sought for a commercial purpose.

9

34. In addition, the requests asked for expedited processing pursuant to 5 U.S.C. § 552(a)(6)(E) and 6 C.F.R. § 5.5(e). As organizations that routinely disseminate information to the public and advocate for government transparency and accountability, Plaintiffs have an urgent need to obtain these records so that they can inform the public about the federal government's activities with respect to its treatment of noncitizens.

35. Plaintiffs have received no response to either Request.

## LEGAL FRAMEWORK

36. The Freedom of Information Act was enacted to facilitate public access to government documents. *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991) (citing *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 151 (1989)). Its basic purpose is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed. *See NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978).

37. With that purpose in mind, the FOIA statute, 5 U.S.C. § 552, requires federal agencies to disclose records in response to a request by a member of the public, unless those records fall within nine narrow statutory exemptions.

38. An agency must respond to a FOIA request within 20 working days after receipt of a request, notifying the requester of the agency's determination whether or not to fulfill the request, providing the reasons for its determination, and informing the requester of his or her right to appeal the agency's determination to the agency head. 5 U.S.C. § 552(a)(6)(A)(i).

39. In "unusual circumstances," an agency may postpone its response to a FOIA request or appeal, but it must provide notice and the date in which a determination is expected to be dispatched. *See* 5 U.S.C. § 552(a)(6)(B). Generally, such notice shall not result in an extension for more than ten working days. *See id*.

40. If the agency fails to comply with a request within the statutory time

period, a FOIA requester is deemed to have exhausted their administrative remedies, and can proceed directly to the district court where the agency must show "exceptional circumstances" justifying its untimeliness and due diligence in remedying the violation. 5 U.S.C. § 552(a)(6)(C); *see Hajro v. U.S. Citizenship & Immigr. Servs.*, 811 F.3d 1086, 1092 (9th Cir. 2016).

41. A district court has jurisdiction to enjoin the agency from withholding records and to order production of records that are subject to disclosure. 5 U.S.C. § 552(a)(4)(B).

42. A FOIA requester can seek a waiver of search and review fees on the ground that the disclosure of the information is in the public interest because it is likely to contribute significantly to the public's understanding of the operations and activities of the government, and is not primarily in the commercial interest of the requester. *See* 5 U.S.C. § 552(a)(4)(A)(iii).

43. A FOIA requester can also seek a waiver of search and review fees on the grounds that the requester is a "representative of the news media," and the records are not sought for a commercial purpose. *See* 5 U.S.C. § 552(a)(4)(A)(ii). A representative of the news media is "any person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience." *Id*.

44. FOIA also allows for requesters to ask for expedited processing of their request for records if they can demonstrate a compelling need. 5 U.S.C. §552(a)(6)(E)(i). The term "compelling need" applies to requesters who are primarily engaged in disseminating information and possess the urgency to inform the public concerning actual or alleged Federal government activity. 5 U.S.C. § 552(a)(6)(E)(v)(II).

//
//

## CAUSES OF ACTION

### First Cause of Action

### Failure To Timely Respond To The Requests

45. Plaintiffs incorporate by reference the above paragraphs as if fully set forth herein.

46. Plaintiffs properly submitted FOIA requests on January 6, 2022.

47. Under 5 U.S.C. § 552(a)(6)(A)(i), ICE had 20 working days after the receipt of the ACLU's requests to make a determination and provide notice of such determination.

48. That time expired on Friday, February 4, 2022.

49. As of February 24, 2022, ICE has not acknowledged or responded to the ACLU's request for records.

50. Defendant's failure to provide a response within the statutory time period is a violation of 5 U.S.C. § 552(a)(6)(A) and the agency's corresponding regulations.

### Second Cause Of Action

### Failure To Make A Reasonable Effort To Search For And Promptly Release Records

51. Plaintiffs incorporate by reference the above paragraphs as if fully set forth herein.

52. Under information and belief, ICE has in its possession a number of responsive documents, including those specifically identified in Plaintiffs' requests, that it failed to produce.

53. ICE failed to respond to Plaintiffs' requests for documents and failed to provide any justification for doing so.

54. As such, ICE's failure to search adequately and promptly produce the materials requested by Plaintiffs violate 5 U.S.C. § 552(a)(3)(A)-(D) and its corresponding regulations.

### Third Cause Of Action

### Failure To Grant Plaintiffs' Requests For A Fee Waiver

55. Plaintiffs incorporate by reference the above paragraphs as if fully set forth herein.

56. Defendant failed to grant plaintiffs request for a fee waiver in violation of 5 U.S.C. § 552(a)(4)(A)(iii) and the agency's corresponding regulations.

### Fourth Cause Of Action

### Failure To Grant Plaintiffs' Requests For A Limitation Of Fees

57. Plaintiffs incorporate by reference the above paragraphs as if fully set forth herein.

58. Defendant failed to grant plaintiffs request for a fee waiver in violation of 5 U.S.C. § 552(a)(4)(A)(ii) and the agency's corresponding regulations.

### Fifth Cause Of Action

### Failure To Grant Requests For Expedited Processing

59. Plaintiffs incorporate by reference the above paragraphs as if fully set forth herein.

60. Defendant failed to make a determination of Plaintiffs' expedited processing requests and failed to provide notice of that determination within 10 days of the requests in violation of 5 U.S.C. § 552(a)(6)(E)(ii)(I) and the agency's corresponding regulations.

61. Defendant also failed to grant Plaintiffs' requests for expedited processing in violation of 5 U.S.C. § 552(a)(6)(E)(i) and the agency's corresponding regulations.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A. Declare that Defendant's failure to respond and produce the requested

|   |   |   |
|---|---|---|
| 1 |   | records is unlawful; |
| 2 | B. | Order Defendant to promptly conduct a thorough search for all responsive records and release them; |
| 4 | C. | Order Defendant to grant Plaintiffs a fee waiver in connection with the Requests; |
| 6 | D. | Award Plaintiffs their costs and reasonable attorneys' fees pursuant to 5 U.S.C. § 552(a)(4)(E); and |
| 8 | E. | Grant all other appropriate relief. |

Respectfully submitted,

Dated: February 24, 2022

/s/ Liga Chia
LIGA CHIA
ACLU Foundation of Southern California

Counsel for Plaintiffs